UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:08-CV-212

NANCY FAULKNER, Individually and as
Administratrix of the Estate of
ROBERT FAVID FAULKNER                                                                   PLAINTIFF

v.

ABB INC.                                                                                           DEFENDANT

## MEMORANDUM OPINION & ORDER

This matter is before the Court upon Defendant ABB, Inc.'s motion for summary judgment as to Plaintiffs' claim for pain and suffering (DN 101). Plaintiff has responded (DN 103). Defendant has replied (DN 129). This matter is now ripe for adjudication. For the following reasons, Defendant's motion is DENIED.

## BACKGROUND

Plaintiff, Nancy Faulkner, brought this products liability action against Defendant ABB, Inc. ("ABB") after her husband, Robert Faulkner, died in a workplace accident.[1] Robert Faulkner was employed by Arkema, Inc., a chemical plant in Calvert City, Kentucky. On October 30, 2007, the Arkema facility underwent a plant-wide power shutdown in order to perform some preventative maintenance. After Robert Faulkner failed to appear for a planned

---

[1] Plaintiff originally brought this action in state court against ABB, Inc. ABB subsequently removed the case to this Court in December 2008 on the basis of diversity jurisdiction. ABB then received leave of this Court to file a third party complaint against Arkema, Inc. for purposes of apportionment of fault, contribution, and indemnity. After discovery revealed that contractors Apex Engineering or Riley Electric may have had some involvement in the installation of the analyzer shelter, and that either Riley Electric or Morsey Contractors installed the conduit, Plaintiff filed an amended complaint naming Riley Electric Company, Morsey Contractors, and Apex Engineering as defendants. In March 2011, this Court dismissed Plaintiff's claims against the added defendants for failure to add the defendants within the one-year statute of limitations. Accordingly, the only remaining parties in this action are Nancy Faulkner and ABB.

meeting at the end of his shift that day, Plaintiff notified Arkema. Arkema employees searched the plant grounds and discovered Robert Faulkner unresponsive inside of an analyzer shelter. Scott Jaco, one of the Arkema employees who first discovered Robert Faulkner, testified that Faulkner's skin color was blue and that he was not breathing. Efforts to revive him were unsuccessful. The investigation determined that Robert Faulkner died of asphyxiation due to nitrogen gas, which displaced the oxygen in the analyzer shelter during the power shutdown.

   The analyzer shelter in question was manufactured by Defendant ABB and purchased by Arkema in 2001 as part of a plant upgrade project. Arkema ordered various analytical instruments from ABB which would evaluate gas samples extracted from the smokestack via sample tubes connected to the instruments. To house these instruments, Arkema also ordered a prefabricated shelter from ABB. Once the shelter was delivered to Arkema, outside contractors completed the connections to the sample lines and utilities, including electricity and instrument air. Instrument air is air that has been purified and dehumidified for technical applications, such as purging analytical instruments. There were two cabinets mounted on the exterior wall of the analyzer shelter. Inside these cabinets were various valves, sample conditioning heaters, and a small electric pump which propelled gas through the lines. The instrument air constantly flowed to cool the electric pump. The instrument air system was designed in such a manner that, in the event of power loss, the instrument air would automatically be replaced by stored nitrogen gas.

   During the October 30, 2007 power shutdown, the instrumentation in the analyzer shelter and the electric pump in the exterior cabinet were shut down; however, the nitrogen gas backup continued to flow from the instrument air line. Sample tubes passing through the exterior cabinet entered the analyzer shelter and connected to the analyzing instruments by means of a metal conduit. Plaintiff contends that, during the power shutdown, nitrogen gas flowed from the

exterior cabinet and migrated into the shelter through those conduits.  The nitrogen then displaced the oxygen inside the analyzer shelter, creating an oxygen-deficient environment.

In her Complaint, Plaintiff alleged that Robert Faulkner experienced pre-death pain and suffering, and therefore seeks compensation for such a loss.  Dr. Diedre Schluckebier, a former state medical examiner, testified in her deposition as to the results of the autopsy she performed on Robert Faulkner on October 31, 2007.  Dr. Schluckebier testified that, upon initial examination, she noticed petechiae, or small, ruptured blood vessels, around Robert Faulkner's eyes and forehead.  Dr. Schluckebier then explained that petechiae are frequently seen in asphyxial types of deaths.  She then testified that the cause of death was attributed to asphyxia via suffocation by exposure to vitiated air, which is decreased oxygen content in the air.  Defendant ABB now moves for summary judgment as to Plaintiff's claim for pain and suffering.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## ANALYSIS

ABB contends that it is entitled to summary judgment as to Plaintiff's claim for pain and suffering because there is no evidence that Robert Faulkner experienced any conscious pain or suffering prior to his death. In response, Plaintiff maintains that Robert Faulkner did endure physical and mental pain and suffering leading up to his death, evidenced by his ruptured blood vessels and the confusion, disorientation, and loss of motor skills he experienced prior to being rendered unconscious.

Under Kentucky law, in a personal injury action, the injured party may recover for any pain and suffering which is the direct result of the injury. *Kentucky Cent. Ins. Co. v. Schneider*, 15 S.W.3d 373, 374 (Ky. 2000). To recover for pain and suffering, the plaintiff must have been sufficiently conscious to have suffered such a loss. *Vitale v. Henchley*, 24 S.W.3d 651, 659 (Ky. 2000). "Damages for pain and suffering may be awarded, however, 'if the injured person was

4

partly conscious, had intervals of consciousness, or was conscious for a short time before death." *Id*.

Thus, to recover for Robert Faulkner's pain and suffering, Plaintiff must show that Robert Faulkner was conscious for some period of time prior to his death. ABB argues that there is no competent evidence upon which a jury could determine the length of time between Robert Faulkner's initial exposure to the oxygen-deficient atmosphere and his loss of consciousness; thus, ABB contends, any award for pain and suffering could only be based on speculation. However, ABB does not point to any case law to support such an argument.

Other courts have allowed awards for pain and suffering even though there was no evidence of the precise amount of time the decedent was conscious before death. In *Caldecott v. Long Island Lighting Co*., the decedent was injured in an explosion and ultimately died of suffocation and burns. 417 F.2d 994 (2d Cir. 1969). Although there was no affirmative evidence that the decedent survived the explosion by a precise amount of time or of for how long he was conscious after the explosion, there was evidence that he survived long enough to breathe in soot from the fire into his lungs. *Id*. at 996. Although the Second Circuit found that the $50,000 award for pain and suffering was excessive and must be set aside unless a remittitur of $40,000 was filed, it did not find that an award for pain and suffering was unsupported by the evidence. *Id*. at 996-97. Likewise, other courts have allowed damages for asphyxiation or suffocation due to drowning when there is evidence that the decedent was conscious when he or she entered the water. *See e.g.*, *Kline v. Maritrans CP, Inc*., 791 F.Supp. 455, 463 (D. Del. 1992) ("Thus, the Court finds that a jury could reasonably infer that upon entry into the water, for some period of time, Kline experienced some pain and suffering."); *Freed v. D.R.D. Pool Service, Inc*., 974 A.2d 978 (Md. App. 2009).

Here, Dr. Schluckebier testified that a normal atmosphere contains between 20-20% oxygen. Referencing notes made during the investigation immediately following the discovery of Robert Faulkner's body, Dr. Schluckebier stated that, with the door to the analyzer shelter shut for four hours, the oxygen level in the air was 11.7%. Twelve hours after Robert Faulkner's body was discovered, the oxygen level was at 7%. Dr. Schluckebier testified that, if a person were to breathe air with an oxygen content of only 11.7%, the person's judgment and coordination would become impaired and then the person would lose consciousness and eventually die. Dr. Schluckebier further testified that if a person were to breathe air with an oxygen content between 8-10%, the person would lose consciousness. If a person were to breathe air with an oxygen content of less than 8%, death would usually occur. When asked how long a person could be exposed to such an oxygen-deficient environment before death would occur, Dr. Schluckebier stated that in an environment with an oxygen content of 5%, a person would lose consciousness within approximately 40 seconds and death would occur within minutes. However, Dr. Schluckebier testified that there was no way of determining the actual oxygen level within the shelter when Robert Faulkner entered.

Viewing Dr. Schluckebier's testimony and the evidence in the light most favorable to Plaintiff, there is a genuine issue as to the following material facts: (1) the oxygen level in the analyzer building at the time Robert Faulkner entered it, (2) the length of time that passed before Robert Faulkner lost consciousness, and (3) the pain and suffering experienced by Robert Faulkner during any period of pre-death consciousness. Regardless of whether or not it is scientifically possible to determine the exact level of oxygen in the air at the time Robert Faulkner entered the analyzer shelter, there is evidence that he would have been conscious for at least several seconds and perhaps even minutes before his death. Dr. Schluckebier's testimony

that a person exposed to air with a 5% oxygen content would lose consciousness after 40 seconds, combined with the evidence of the oxygen content of the air inside the analyzer shelter in the hours after Robert Faulkner's death, is sufficiently precise for a jury to determine that Robert Faulkner was conscious at least for a short time prior to his death. Because there is evidence on which a reasonable jury could conclude that Robert Faulkner consciously experienced at least some degree of pain and suffering before he died, summary judgment is inappropriate.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's motion for summary judgment as to Plaintiff's claim for pain and suffering (DN 101) is DENIED.