UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:08-CV-212-R

NANCY FAULKNER, individually
and as Administratrix of the Estate of
ROBERT FAULKNER                                                                PLAINTIFF

V.

ABB, INC.                                                                        DEFENDANT

## MEMORANDUM OPINION & ORDER

This matter is before the Court upon Plaintiff's omnibus motion in limine, seeking

evidentiary rulings on several categories of evidence (DN 122).  Defendant ABB, Inc. has

responded.  This matter is now ripe for adjudication.

## BACKGROUND

Plaintiff, Nancy Faulkner, brought this products liability action against Defendant ABB,

Inc. ("ABB") after her husband, Robert David Faulkner, died in a workplace accident.[1]  Robert

Faulkner was employed by Arkema, Inc. ("Arkema"), a chemical plant in Calvert City,

Kentucky.  On October 30, 2007, the Arkema facility underwent a plant-wide power shutdown in

order to perform preventative maintenance.  After Robert Faulkner failed to appear for a planned

meeting at the end of his shift that day, Plaintiff notified Arkema.  Arkema employees searched

---

[1] Plaintiff originally brought this action in state court against ABB, Inc.  ABB subsequently
removed the case to this Court in December 2008 on the basis of diversity jurisdiction.  ABB
then received leave of this Court to file a third party complaint against Arkema, Inc. for purposes
of apportionment of fault, contribution, and indemnity.  After discovery revealed that contractors
Apex Engineering or Riley Electric may have had some involvement in the installation of the
analyzer shelter, and that either Riley Electric or Morsey Contractors installed the conduit,
Plaintiff filed an amended complaint naming Riley Electric Company, Morsey Contractors, and
Apex Engineering as defendants.  In March 2011, this Court dismissed Plaintiff's claims against
the added defendants for failure to add the defendants within the one-year statute of limitations.
Accordingly, the only remaining parties in this action are Nancy Faulkner and ABB.

the plant grounds and discovered Robert Faulkner unresponsive inside of an analyzer shelter. Scott Jaco, one of the Arkema employees who first discovered Robert Faulkner, testified that Faulkner's skin color was blue and that he was not breathing.  Efforts to revive him were unsuccessful.  The investigation determined that Robert Faulkner died of asphyxiation due to nitrogen gas, which displaced the oxygen in the analyzer shelter during the power shutdown.

 The analyzer shelter in question was manufactured by ABB and purchased by Arkema in 2001 as part of a plant upgrade project.  Arkema ordered various analytical instruments from ABB which would evaluate gas samples extracted from the smokestack via sample tubes connected to the instruments.  To house these instruments, Arkema also ordered a prefabricated shelter from ABB.   Once the shelter was delivered to Arkema, outside contractors completed the connections to the sample lines and utilities, including electricity and instrument air. Instrument air is air that has been purified and dehumidified for technical applications, such as purging analytical instruments.  There were two cabinets mounted on the exterior wall of the analyzer shelter.  Inside these cabinets were various valves, sample conditioning heaters, and a small electric pump which propelled gas through the lines.  The instrument air constantly flowed to cool the electric pump.  The instrument air system was designed in such a manner that, in the event of power loss, the instrument air would automatically be replaced by stored nitrogen gas.

 During the October 30, 2007 power shutdown, the instrumentation in the analyzer shelter and the electric pump in the exterior cabinet were shut down; however, the nitrogen gas backup continued to flow from the instrument air-line.  Sample tubes passing through the exterior cabinet entered the analyzer shelter and connected to the analyzing instruments by means of a metal conduit.  Plaintiff contends that, during the power shutdown, nitrogen gas flowed from the

exterior cabinet and migrated into the shelter through those conduits.  The nitrogen then displaced the oxygen inside the analyzer shelter, creating an oxygen-deficient environment.

Dr. Diedre Schluckebier, a former state medical examiner, testified in her deposition as to the results of the autopsy she performed on Robert Faulkner on October 31, 2007.  Dr. Schluckebier testified that, upon initial examination, she noticed petechiae, or small, ruptured blood vessels, around Robert Faulkner's eyes and forehead.  Dr. Schluckebier then explained that petechiae are frequently seen in asphyxial types of deaths.  She then testified that the cause of death was attributed to asphyxia via suffocation by exposure to vitiated air, which is decreased oxygen content in the air.

## STANDARD

Motions in limine provided in advance of trial are appropriate if they eliminate evidence that has no legitimate use at trial for any purpose.  *Jonasson v. Lutheran Child & Family Serv.,* 115 F.3d 436, 440 (7th Cir.1997); *Bouchard v. Am. Home Products Corp.,* 213 F.Supp.2d 802, 810 (N.D.Ohio 2002) ("The court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds." (citing *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984))).  Only where the evidence satisfies this high bar should the court exclude it; if not, "rulings [on evidence] should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Gresh v. Waste Serv. of Am., Inc.,* 738 F.Supp.2d 702, 706 (E.D.Ky.2010) (quoting *Indiana Ins. Co. v. Gen. Elec. Co.,* 326 F.Supp.2d 844, 846 (N.D.Ohio 2004)).  Even if a motion in limine is denied, the court may revisit the decision at trial when the parties have more thoroughly presented the disputed evidence.  *See id.* ("Denial of a motion in limine does not guarantee that

the evidence will be admitted at trial, and the court will hear objections to such evidence as they

arise at trial.").

## DISCUSSION

### 1.  Evidence or Testimony Related to the Fault of Robert Faulkner

Plaintiff asks the Court to exclude all evidence or testimony related to any fault Robert

Faulkner may have had in causing his own injuries and death.  In support of this request, Plaintiff

argues that there is no evidence Mr. Faulkner did anything to contribute to his death and it would

be "rank speculation" to attribute any fault to him.  In response, Defendant argues that it is

entitled to explore evidence at trial that Robert Faulkner contributed to his death or impaired

Arkema's ability to timely locate him by failing to sign in prior to entering the analyzer shelter as

required by plant protocol.  In a products liability action, the plaintiff's own negligence with

respect to the product itself is governed by the same comparative fault principles which govern

the fault of parties in any tort action.  *See Caterpillar, Inc. v. Brock*, 915 S.W.2d 751 (Ky. 1996).

Because evidence of Robert Faulkner's own fault would have a legitimate use at trial, Plaintiff's

request to exclude evidence or testimony related to Robert Faulkner's fault is DENIED.

### 2.  Evidence or Argument that Robert Faulkner Did Not Suffer Prior to his Death

Plaintiff asks the Court to exclude all evidence or argument that Robert Faulkner did not

suffer during his exposure to nitrogen.  In support of this request, Plaintiff argues that Dr.

Schluckebier's testimony is uncontroverted and that any argument that Robert Faulkner did not

suffer would be unfounded and contrary to the evidence.[2]  In response, Defendant argues that Dr.

---

[2] In the motion in limine, Plaintiff states that Dr. Schluckebier testified that Mr. Faulkner would
have become "confused, disoriented, weak, dizzy, and scared," and that he would have lost
control over his muscles causing him to fall to the ground.  However, Dr. Schluckebier made no
such quote and did not testify that Mr. Faulkner would have lost control of his muscles causing
him to fall to the ground.  Instead, Dr. Schluckebier testified generally that, if a person were to

Schluckebier's testimony does not affirmatively establish that Robert Faulkner suffered prior to his death.  As this Court explained in its Memorandum Opinion denying Defendant's motion for partial summary judgment on Plaintiff's pain and suffering claim, Dr. Schluckebier's testimony provided some evidence that Robert Faulkner may have suffered prior to his death.  However, this ruling does not preclude the admission of contrary evidence or argument.  This issue can be re-examined at the close of all the evidence.  Accordingly, Plaintiff's request that such evidence and argument be excluded is DENIED.

**3.  Evidence of Alternative Cause of Death**

Plaintiff asks this Court to exclude any evidence of an alternative cause of death because it is undisputed that Robert Faulkner died as a result of asphyxiation due to an oxygen-deficient environment.  In response, Defendant states that it does not anticipate offering any evidence of an alternative cause of death.  For this reason, this issue is MOOT.  If Defendant seeks to introduce evidence of an alternative cause of death at trial, the Court will reconsider Plaintiff's request to exclude such evidence.

**4.  Evidence or Reference to KOSHA Violations**

Plaintiff asks the Court to exclude any evidence of or reference to Arkema's violation of Kentucky Occupational Safety and Health Program ("KOSHA") regulations because the

---

breathe air with an oxygen content of only 11.7%, the person's judgment and coordination would become impaired and then the person would lose consciousness and eventually die.  Dr. Schluckebier further testified that if a person were to breathe air with an oxygen content between 8-10%, the person would lose consciousness.  If a person were to breathe air with an oxygen content of less than 8%, death would usually occur.  When asked how long a person could be exposed to such an oxygen-deficient environment before death would occur, Dr. Schluckebier stated that in an environment with an oxygen content of 5%, a person would lose consciousness within approximately 40 seconds and death would occur within minutes.  However, Dr. Schluckebier testified that there was no way of determining the actual oxygen level within the shelter when Robert Faulkner entered.

admission of such evidence would impermissibly alter the civil standard of liability.[3]

Specifically, Plaintiff asks the Court to prohibit witnesses from commenting on or interpreting

KOSHA regulations, to prohibit evidence that Arkema was cited by KOSHA, and to prohibit any

argument that these KOSHA violations tend to show that Arkema was at fault for Robert

Faulkner's death.  In support of this argument, Plaintiff cites to *Beverly v. Meva Formwork*

*Systems Inc*., 2010 WL 1904460 (E.D. Ky May 11, 2010) and *Minichello v. U.S. Industries, Inc*.,

756 F.2d 26 (6th Cir. 1985).

      In *Beverly*, the plaintiff was injured while working for Becon Construction Company

("Becon") when a concrete form supplied by Meva Formwork Systems, Inc. ("Meva") collapsed

on top of him.  2010 WL 1904460 at *1.  Meva sought to exclude a portion of the subsequent

KOSHA report, which was the result of an investigation to determine if there was sufficient

evidence to issue a citation against Becon for violating the applicable KOSHA standards.  *Id*.

Meva argued that whether or not Becon violated KOSHA standards was not relevant to whether

or not Meva acted negligently in a way that contributed to the plaintiff's injuries.  *Id*. at *2.  The

district court found that the plaintiff failed to show how the KOSHA report was relevant to

establishing the elements of Meva's negligence.  *Id*.  The court further stated that, "[g]iven the

different standard applied to negligence cases versus the standard applied in determining whether

an OSHA standard was violated, . . . admission of the challenged portion of the report would

likely confuse jurors."  The court therefore found that the introduction of the challenged portion

of the report would be irrelevant and unfairly prejudicial and excluded it as such.  *Id*.

      In *Minichello*, the plaintiff worked as a tool and die maker for Ford Motor Company and

was injured while working on a machine, manufactured by the defendant U.S. Industries'

---

[3] Following Robert Faulkner's workplace death, KOSHA investigated the accident and
concluded that Arkema violated several safety regulations.

predecessor in interest.  756 F.2d at 28.   The plaintiff then filed a products liability action

against U.S. Industries.  *Id*.  A jury trial was held which ended in a verdict for the defendant.  *Id*.

On appeal, the plaintiff argued that the trial court erred in allowing the defendant to question the

plaintiff's expert witness regarding OSHA regulations that were at odds with the expert's

testimony that the product was unreasonably dangerous.  *Id*. at 28-29.  The Sixth Circuit found

that, because the Occupational Safety and Health Act specifically states that it is not intended to

affect the civil standard of liability,[4] "[t]o use OSHA regulations to establish whether a product is

unreasonably dangerous is thus improper."  *Id*. at 29.  The court further noted that OSHA

regulations were not relevant to the issue of U.S. Industries' liability to the plaintiff because

OSHA regulations pertain only to the employer's conduct and not to the producer-consumer

relationship.  *Id*.  Thus, *Beverly* and *Minichello* both stand for the proposition that evidence of

KOSHA or OSHA regulations is not admissible to show that a product is unreasonably

dangerous.

In *Williams v. J.I. Case Co.*, No. 91-5706, 963 F.2d 374 *2 (6th Cir. 1992) (unpublished),

the Sixth Circuit clarified that, under Kentucky law, KOSHA regulations are admissible to

establish the relevant standard of care for employers.  In that case, the plaintiff was employed by

South State Contractors, Inc. to hang sheet metal siding on an airplane hangar.  *Id*. at *1.  To

reach the upper portions of the hangar, the plaintiff stood in a work basket attached to the forks

---

[4] The Occupational Safety and Health Act states, in pertinent part:

> Nothing in this Act shall be construed to supersede or in any manner affect any
> workmen's compensation law or to enlarge or diminish or affect in any other
> manner the common law or statutory rights, duties or liabilities of employers and
> employees under any law with respect to injuries, diseases, or death of employees
> arising out of, or in the course of employment.

29 U.S.C. § 653(b)(4).  KOSHA contains an identical provision.  KRS § 338.021(2).

of a forklift purchased from J.I. Case Co.  *Id*.  The mechanism that raised, lowered, and supported the forks was manufactured by Harlo Corporation.  *Id*.  The plaintiff was injured when the work basket detached from the fork lift, causing the plaintiff to fall from an elevation of 28-feet.  *Id*.  The design of the forklift called for the forks to be held in place by removal roll pins.  *Id*.  The roll pins supporting the fork to which the plaintiff's work basket was attached had been removed, causing the plaintiff's work basket to detach.  *Id*.

After recovering workers' compensation, the plaintiff and South State's insurance carrier brought a products liability action against Case and Harlo.  *Id*.  The defendants then filed a third-party complaint against South State.  *Id*.  At trial, the defendant alleged that the failure of the plaintiff's employer, South State, to replace the roll pins was the proximate cause of the plaintiff's injuries.  *Id*.  In support of this argument, the defendant introduced testimony regarding South State's failure to comply with OSHA and KOSHA requirements.  *Id*.  The trial court instructed the jury that South State had a duty to exercise ordinary care to furnish the plaintiff with a safe workplace and safe equipment and that these duties included complying with KOSHA regulations.  *Id*.  The jury found that South State breached its duty to the plaintiff, but that the defendant did not breach its duty to the plaintiff.  *Id*.

On appeal, the plaintiff argued that evidence regarding OSHA or KOSHA regulations, or non-compliance therewith, was not admissible as evidence of an employer's standard of care or as evidence establishing negligence per se.  *Id*. at *2.  The Sixth Circuit disagreed, noting that:

> Kentucky courts have interpreted section 338.021(2) as meaning only that KOSHA does not establish an independent cause of action; it does not preclude the use of KOSHA regulations as a basis of liability in a cause of action established in another statute or at common law. *Kentucky Utils. Co. v. Auto Crane Co.,* 674 S.W.2d 15, 17 (Ky.App.1983); *Barnet of Kentucky, Inc. v. Sallee,* 605 S.W.2d 29 (Ky.App.1980); *Childers v. International Harvester Co.,* 569 S.W.2d 675, 677 (Ky.App.1977).  Kentucky law is clear that, where applicable, KOSHA regulations may establish the relevant standard of care.

*Id*. The Sixth Circuit also noted that several federal circuit courts are in accord with the position that KOSHA or OSHA may be used to establish the standard of care under an existing cause of action. *Id*. (citing *Rabon v. Automatic Fasteners, Inc.,* 672 F.2d 1231, 1238 (5th Cir. Unit B 1982); *Pratico v. Portland Terminal Co.,* 783 F.2d 255, 264-66 (1st Cir.1985); *Donovan v. General Motors,* 762 F.2d 701, 705-06 (8th Cir.1985)).

Applying the relevant case law, KOSHA regulations would be inadmissible to show that ABB's product was unreasonably dangerous. However, like in *Williams*, the applicable KOSHA regulations may establish the relevant standard of care for Robert Faulkner's employer, Arkema. Thus, testimony regarding the applicable KOSHA regulations are admissible as evidence that Arkema's alleged negligence was the proximate cause of Robert Faulkner's death. Accordingly, Plaintiff's request that the Court exclude any reference to KOSHA violations at Arkema is DENIED.

**5.  Evidence of Fault of Non-Parties**

Plaintiff asks the Court to exclude any evidence of the fault of non-parties to this action, specifically, Morsey Constructors, LLC, Riley Electric Company, Inc., and Apex Engineering, Inc. Nearly a year after instituting this action, Plaintiff amended her complaint to add these three entities as defendants (DN 53). However, the Court found that the statute of limitations had expired as to these defendants and dismissed them from this action (DN 72).

In support of the request to exclude evidence of the fault of these entities, Plaintiff cites KRS § 411.182 and *Baker v. Webb*, 883 S.W.2d 898 (Ky. App. 1994). Kentucky's comparative negligence statute, KRS § 411.182, provides in pertinent part:

> (1) In all tort actions, including products liability actions, involving fault of more than one party to the action, including third-party defendants and persons who have been released [under settlement agreements] . . . the court, unless otherwise

agreed by all parties, shall instruct the jury to answer interrogatories . . . indicating:

> (a) The amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and

> (b) The percentage of the total fault of all the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability . . . .

KRS § 411.182(1). In *Baker*, a case where the non-party included in the trial court's apportionment instructions was never impleaded as a third-party defendant, a Kentucky Court of Appeals remarked in dictum that third-party defendants become subject to apportionment of fault under KRS § 411.182 "if such persons are not properly dismissed." 883 S.W.2d at 899. The court of appeals went on to note that KRS § 411.182 "limits allocation of fault to those who *actively* assert claims, offensively or defensively, as parties in the litigation or who have settled by release or agreement." *Id.* at 900.

Plaintiff argues that, because ABB did not name Morsey Constructors, Riley Electric, or Apex Engineering as third-party defendants, ABB is barred from putting forth evidence that these entities are liable for Robert Faulkner's death. However, Plaintiff's argument ignores the fact that *she joined* Morsey Constructors, Riley Electric, or Apex Engineering as defendants in this action. The Kentucky Supreme Court has held that apportionment is permitted when there is an active assertion of a claim against one who would be a defendant but for the fact that he was dismissed upon statute of limitations grounds. *Prudential Life Insurance Company v. Moody*, 696 S.W.2d 503 (Ky. 1985).[5] Here, Plaintiff actively asserted claims against Morsey

---

[5] Although the Prudential Life decision was rendered three years before the enactment of KRS § 411.182(1), its holding remains relevant. In *Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d 467, 472 n. 5 (Ky. 2001), the Kentucky Supreme Court stated as follows:

Constructors, Riley Electric, and Apex Engineering, but those claims were dismissed because the statute of limitations had expired.  Thus, if the evidence at trial shows that Morsey Constructors, Riley Electric, or Apex Engineering caused some portion of Plaintiff's damages, ABB will be entitled to an apportionment instruction even if these three entities cannot be liable to Plaintiff. It would be unjust to hold ABB liable for more than its share of the fault because Plaintiff waited too long to assert claims against other potentially liable parties.  *See Adam v. J.B. Hunt Transport, Inc.*, 130 F.3d 219, 230 (6th Cir. 1997) (abrogated on other grounds).  Accordingly, Plaintiff's request that the Court exclude evidence of the fault of Morsey Constructors, Riley Electric, or Apex Engineering is DENIED.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's motion in limine is DENIED.

---

[F]ault may not be properly allocated to a party, a dismissed party or settling nonparty unless the court or the jury first find that the party was at fault; otherwise, the party has no fault to allocate. KRS 411.182; *Floyd v. Carlisle Construction Co., Inc.,* 758 S.W.2d 430, 432 (Ky.1988) ("If there is an active assertion of a claim against joint tortfeasors and *the evidence is sufficient to submit the issue of liability to each,* an apportionment instruction is required whether or not each of the tortfeasors is a party-defendant at the time of the trial." *Id.* (emphasis added)). The mere fact that a party has been sued or has settled does not permit the factfinder to allocate part of the total fault to that party.