UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:08-CV-212

NANCY FAULKNER, Individually
and as Administratrix of the
Estate of ROBERT FAULKNER                                              PLAINTIFF

V.

ABB, INC.                                                               DEFENDANT

## OPINION & ORDER

This matter is before the Court upon Defendant ABB, Inc.'s *motion in limine* to exclude testimony or argument that the analyzer shelter at issue was defective due to the absence of atmospheric monitoring devices or alarms (DN 128).  Plaintiff has responded (DN 170) and Defendant has replied (DN 173).  For the following reasons, Defendant's motion (DN 128) is DENIED.

### BACKGROUND

Plaintiff, Nancy Faulkner, brought this products liability action against Defendant ABB, Inc. ("ABB") after her husband, Robert David Faulkner, died in a workplace accident.[1]  Robert Faulkner was employed by Arkema, Inc. ("Arkema"), a chemical plant in Calvert City, Kentucky.  On October 30, 2007, the Arkema facility underwent a plant-wide power shutdown in

---

[1] Plaintiff originally brought this action in state court against ABB, Inc.  ABB subsequently removed the case to this Court in December 2008 on the basis of diversity jurisdiction.  ABB then received leave of this Court to file a third party complaint against Arkema, Inc. for purposes of apportionment of fault, contribution, and indemnity.  After discovery revealed that contractors Apex Engineering or Riley Electric may have had some involvement in the installation of the analyzer shelter, and that either Riley Electric or Morsey Contractors installed the conduit, Plaintiff filed an amended complaint naming Riley Electric Company, Morsey Contractors, and Apex Engineering as defendants.  In March 2011, this Court dismissed Plaintiff's claims against the added defendants for failure to add the defendants within the one-year statute of limitations.  Accordingly, the only remaining parties in this action are Nancy Faulkner and ABB.

order to perform preventative maintenance. After Robert Faulkner failed to appear for a planned meeting at the end of his shift that day, Plaintiff notified Arkema. Arkema employees searched the plant grounds and discovered Robert Faulkner unresponsive inside of an analyzer shelter. Scott Jaco, one of the Arkema employees who first discovered Robert Faulkner, testified that Faulkner's skin color was blue and that he was not breathing. Efforts to revive him were unsuccessful. The investigation determined that Robert Faulkner died of asphyxiation due to nitrogen gas, which displaced the oxygen in the analyzer shelter during the power shutdown.

The analyzer shelter in question was manufactured by ABB and purchased by Arkema in 2001 as part of a plant upgrade project. Arkema ordered various analytical instruments from ABB which would evaluate gas samples extracted from the smokestack via sample tubes connected to the instruments. To house these instruments, Arkema also ordered a prefabricated shelter from ABB. According to ABB, it installed the analytical instruments and the analyzer shelter in accordance with Arkema's specifications. In accordance with Arkema's specifications, the analyzer shelter was equipped with a power ventilator and a wall-mounted air-conditioning unit. At some point after delivery, but before Robert Faulkner's death, Arkema installed sensors detecting the presence of carbon monoxide or diminished oxygen in the analyzer shelter, which were connected to warning lights and an audible alarm horn.

Once the shelter was delivered to Arkema, outside contractors completed the connections to the sample lines and utilities, including electricity and instrument air. Instrument air is air that has been purified and dehumidified for technical applications, such as purging analytical instruments. There were two cabinets mounted on the exterior wall of the analyzer shelter. Inside these cabinets were various valves, sample conditioning heaters, and a small electric pump which propelled gas through the lines. The instrument air constantly flowed to cool the electric

pump. The instrument air system was designed in such a manner that, in the event of power loss, the instrument air would automatically be replaced by stored nitrogen gas. ABB contends that it was not informed that Arkema's system was configured so that instrument air automatically backed-up with nitrogen gas plant-wide.

During the October 30, 2007 power shutdown, the instrumentation in the analyzer shelter and the electric pump in the exterior cabinet were shut down; however, the nitrogen gas backup continued to flow from the instrument air-line. Sample tubes passing through the exterior cabinet entered the analyzer shelter and connected to the analyzing instruments by means of a metal conduit. Plaintiff contends that, during the power shutdown, nitrogen gas flowed from the exterior cabinet and migrated into the shelter through those conduits. The nitrogen then displaced the oxygen inside the analyzer shelter, creating an oxygen-deficient environment. Because the power was shut down, the sensors detecting diminished oxygen levels in the analyzer shelter were not operating. It is Plaintiff's position that the analyzer shelter manufactured by ABB was defective due to ABB's failure to account for the use of back-up nitrogen.

ABB now moves to exclude any testimony regarding the absence of atmospheric monitoring devices or alarms at the time of manufacturing, due to the fact that such devices were installed in the analyzer shelter by Arkema prior to Robert Faulkner's accident. In response, Plaintiff contends that evidence that the analyzer shelter did not contain an atmospheric monitoring devices or alarms at the time it was delivered to Arkema is relevant to show that ABB did not act with reasonable care and that ABB designed the analyzer shelter without sufficient specifications from Arkema. Plaintiff further contends that ABB could not delegate its

duty to warn to Arkema and that any safety devices installed by Arkema after the delivery of the analyzer shelter did not cure the unreasonably dangerous condition created by ABB.

## STANDARD

Motions in limine provided in advance of trial are appropriate if they eliminate evidence that has no legitimate use at trial for any purpose. *Jonasson v. Lutheran Child & Family Serv.,* 115 F.3d 436, 440 (7th Cir.1997); *Bouchard v. Am. Home Products Corp.,* 213 F.Supp.2d 802, 810 (N.D.Ohio 2002) ("The court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds." (citing *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984))). Only where the evidence satisfies this high bar should the court exclude it; if not, "rulings [on evidence] should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Gresh v. Waste Serv. of Am., Inc.,* 738 F.Supp.2d 702, 706 (E.D.Ky.2010) (quoting *Indiana Ins. Co. v. Gen. Elec. Co.,* 326 F.Supp.2d 844, 846 (N.D.Ohio 2004)). Even if a motion in limine is denied, the court may revisit the decision at trial when the parties have more thoroughly presented the disputed evidence. *See id.* ("Denial of a motion in limine does not guarantee that the evidence will be admitted at trial, and the court will hear objections to such evidence as they arise at trial.").

## DISCUSSION

The issue for this Court is whether ABB's failure to install atmospheric monitoring devices and alarms at the time it manufactured the analyzer shelter is relevant to Plaintiff's claims, given the fact that Arkema installed such devices subsequent to the delivery of the analyzer shelter but prior to Mr. Faulkner's accident.

Plaintiff's theory is that the analyzer shelter, as delivered, was defective because ABB failed to account for the use of Arkema's nitrogen back-up system.  The Court gleans that it is Plaintiff's position that ABB should have accounted for the use of back-up nitrogen by installing atmospheric monitoring devices and alarms which would function in the event of a power outage – either through the installation of a back-up power system for the analyzer shelter or through the installation of an atmospheric monitoring device which did not rely upon power for its operation.  Although ABB argues that Arkema's subsequent installation of an atmospheric monitoring device and alarm renders its failure to do so immaterial, Plaintiff argues that Arkema's installation did not cure the defect that existed at the time the analyzer shelter was delivered to Arkema.

The Court agrees with Plaintiff and will not exclude testimony regarding the absence of monitoring devices and alarms at the time of manufacturing.  Under the Federal Rules of Evidence, "[a]ll relevant evidence is admissible."  Fed. R. Evid. 402.  Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Arkema's installation of such devices – which did not operate in a power outage – did not negate or cure the product defect alleged by Plaintiff.  As such, the absence of such devices is relevant to show that the analyzer shelter was defective at the time of manufacturing.[2]

## CONCLUSION

---

[2] Adopting the Restatement (Second) of Torts § 402A, Kentucky imposes strict liability when the "'design itself selected by the manufacturer amounted to a defective condition which was unreasonably dangerous.'" *Morales v. American Honda Motor Co.,* 71 F.3d 531, 536 (6th Cir.1995) (citing *Nichols v. Union Underwear Co.,* 602 S.W.2d 429, 433 (Ky.1980)).  The plaintiff must establish causation under the substantial factor test—that is, the plaintiff must prove that the defendant's conduct was a substantial factor in bringing about plaintiff's harm. *Id.*

For the foregoing reasons, Defendant's motion in limine (DN 128) is DENIED.